IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

VIRGINIA C. HIGGINBOTHAM,           )
                                    )
            Plaintiff,              )
                                    )
v.                                  )          CIVIL ACTION NO. 5:07-00435
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
            Defendant.              )

M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-

1383f. This case is presently pending before the Court on the Plaintiff's Brief in Support of

Complaint (Document No. 12.) and Defendant's Motion for Judgment on the Pleadings. (Document

No. 13.) Both parties have consented in writing to a decision by the United States Magistrate Judge.

(Document Nos. 5 and 6.)

The Plaintiff, Virginia C. Higginbotham (hereinafter referred to as "Claimant"), filed

applications for DIB and SSI on February 8, 2006, alleging disability as of November 30, 2005, due

to diabetes, nerve problems, back and pinched rotator cuff, neuropathy in her feet and hands, bipolar

disorder, panic attacks, and high cholesterol.[1] (Tr. at 105-07, 108-11, 132.) The claim was denied

initially and upon reconsideration. (Tr. at 58-60, 63-65, 69-71, 72-74.) On October 27, 2006,

Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 81.) The hearing

---

[1] In her request for reconsideration, Claimant alleged disability due to the additional
impairment of her heart beating too fast. (Tr. at 69, 72.)

was held on April 19, 2007, before the Honorable John Murdock. (Tr. at 21-53.) By decision dated May 22, 2007, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 12-20.) The ALJ's decision became the final decision of the Commissioner on June 21, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 4-6.) On July 12, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain

2

v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether

the claimant is able to perform other forms of substantial gainful activity, considering claimant's

remaining physical and mental capacities and claimant's age, education and prior work experience.

20 C.F.R. §§ 404.1520(f), 416.920(f) (2006). The Commissioner must show two things: (1) that the

claimant, considering claimant's age, education, work experience, skills and physical shortcomings,

has the capacity to perform an alternative job, and (2) that this specific job exists in the national

economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must

follow a special technique at every level in the administrative review process." 20 C.F.R. §§

404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs

and laboratory findings to determine whether the claimant has a medically determinable mental

impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the

impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those

sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional
> limitations is a complex and highly individualized process that requires us to
> consider multiple issues and all relevant evidence to obtain a longitudinal picture of
> your overall degree of functional limitation. We will consider all relevant and
> available clinical signs and laboratory findings, the effects of your symptoms, and
> how your functioning may be affected by factors including, but not limited to,
> chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent
> to which your impairment(s) interferes with your ability to function independently,
> appropriately, effectively, and on a sustained basis. Thus, we will consider such
> factors as the quality and level of your overall functional performance, any episodic
> limitations, the amount of supervision or assistance you require, and the settings in
> which you are able to function. See 12.00C through 12.00H of the Listing of
> Impairments in appendix 1 to this subpart for more information about the factors we
> consider when we rate the degree of your functional limitation.
> (3) We have identified four broad functional areas in which we will rate the

degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 14, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from diabetes mellitus and peripheral neuropathy, which were severe impairments. (Tr. at 14, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 16, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for work at the light level of exertion, requiring an avoidance of concentrated exposure to temperature extremes, vibration, hazardous machinery, and dangerous heights. (Tr. at 16, Finding No. 5.) At step four, the ALJ found that Claimant could return to her past relevant work as a cashier. (Tr. at 19, Finding No. 6.) On this basis, benefits were denied. (Tr. at 19-20, Finding No. 7.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was

5

defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on August 4, 1964, and was 42 years old at the time of the administrative hearing. (Tr. at 25, 105, 108.) Claimant had a twelfth grade education. (Tr. at 25, 137.) In the past, she worked as a home healthcare provider and a cashier/checker. (Tr. at 25, 42-43, 49, 133.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in not giving great weight to the opinion and residual functional capacity assessment of Claimant's treating physician, S. S. Maducdoc, M.D., without suitable explanation as to why he failed to give greater weight to Dr. Maducdoc's opinion. (Document No. 12 at 4-6.)

6

Claimant alleges that the ALJ failed to consider the length of Dr. Maducdoc's treatment relationship and Dr. Maducdoc's specialization, as required by the Regulations. (Id. at 5.) The Commissioner asserts that the ALJ properly gave less weight to Dr. Maducdoc's opinion in accordance with the Regulations because his opinion was inconsistent with his own treatment notes and the evidence of record. (Document No. 13 at 13.) Though Claimant relies on the case of Wilson v. Heckler, 743 F.2d 218 (4th Cir. 1984), the Commissioner asserts that such reliance is misplaced because the physicians' opinions in that case were uncontradicted, whereas in the instant case, "ample evidence contradicts Dr. Maducdoc's opinion, including his own examination findings and the opinions of two state agency physicians." (Id. at 14.) Accordingly, the Commissioner asserts that Claimant's argument is without merit and that substantial evidence supports the ALJ's decision. (Id. at 14-15.) Analysis.

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine

whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2), 416.927(d)(2)(2006).

The medical evidence of record demonstrates that Dr. Serafino S. Maducdoc Jr., M.D., began treating Claimant on March 27, 2006, for complaints of diabetes mellitus and neuropathy. (Tr. at 213, 327.) On April 4, 2006, Dr. Maducdoc diagnosed diabetes mellitus type 2 and hyperlipidemia, and noted calcifications of her right breast. (Tr. at 326.) Dr. Maducdoc noted on May 1, 2006, that Claimant complained of migraine headaches for three days. (Tr. at 325.) On May 8, 2006, Claimant reported chest pain, and Dr. Maducdoc diagnosed acute anxiety. (Tr. at 324.)

At the request of the Agency, Dr. Maducdoc completed a disability determination examination of Claimant on May 18, 2006. (Tr. at 258-65.) Claimant reported pain in her feet and hands, that she had tried to commit suicide before last Christmas, pain in her lower back, and a pinched left rotator cuff. (Tr. at 258.) Dr. Maducdoc noted that Claimant also had hypertension, diabetes mellitus, and hyperlipidemia. (Id.) A review of systems revealed generalized weakness, off and on neck pain rated at level six on a scale of one to ten, some sore throat, off and on substernal chest pains, a left ovarian cyst, no abdominal pain, left knee pain rated at a level eight out of ten, and

8

bipolar disorder. (Tr. at 259.) On examination, Claimant exhibited full range of motion of joints, could make a fist and appose her fingers, normal upper extremity strength and grip, normal fine manipulation, lower extremity strength at level four out of five, no sensory deficits, normal gait, and an ability to walk on her toes and heels. (Tr. at 259-60.) Dr. Maducdoc diagnosed diabetic neuropathy in both legs and feet, diabetes mellitus type 2, acute depression, and bipolar disorder. (Tr. at 260.) He noted that Claimant's prognosis was poor and advised her to go the emergency room at Beckley Appalachian Regional Hospital to see Dr. Hasan, which Claimant refused to do. (Tr. at 261.)

Claimant returned to Dr. Maducdoc on June 21, 2006, complaining of pain in her right breast. (Tr. at 323.) On July 14, 2006, Claimant reported daily frontal headaches, which lasted four to five hours and required one emergency room visit. (Tr. at 322.) On October 25, 2006, Dr. Maducdoc completed a Medical Assessment of Ability to Do Work-Related Activities (Physical). (Tr. at 320-21.) Dr. Maducdoc opined that Claimant was limited to lifting ten pounds occasionally and five pounds frequently due to her low back pain.[3] (Tr. at 19, 320.)

Claimant did not return to Dr. Maducdoc until January 10, 2007, at which time he diagnosed acute bronchitis and noted that Claimant continued to smoke one pack of cigarettes per day. (Tr. at 368.) On January 30, 2007, Dr. Maducdoc diagnosed vertigo, and on March 20, 2007, he referred Claimant to a neurologist. (Tr. at 365.)

---

[3] Claimant asserts on page four of her brief that she attached a "complete copy of Exhibit 15F, which was not included in the official transcript." (Document No. 12 at 4.) Exhibit 15F represents the October 26, 2006, assessment of Dr. Maducdoc. Claimant however, did not provide the Court with a copy of the complete assessment. Nevertheless, it does not appear that a complete copy was provided to the ALJ, either, as the ALJ references in his decision only Dr. Maducdoc's lifting limitations. (Tr. at 19.) For the Court to consider evidence not presented to the Commissioner, Claimant would have to demonstrate that such evidence constitutes new evidence, which she has not done in this case. Accordingly, the Court considers Dr. Maducdoc's assessment as it is contained in the administrative transcript.

In addition to Dr. Maducdoc's treatment of Claimant, the medical evidence of record demonstrates that Claimant was examined by Dr. Joshy Abraham, M.D., at the request of Dr. Maducdoc, to evaluate Claimant's complaints of palpitations. (Tr. at 294-95.) Dr. Abraham's physical examination on August 4, 2006, essentially was normal, and he diagnosed palpitations, rule out cardiac arrhythmia; depression; and a history of hypertension and diabetes mellitus. (Id.) On September 5, 2006, Dr. Abraham examined Claimant on follow-up of her palpitations and noted that x-rays and a Holter monitor were normal, revealing no arrhythmia. (Tr. at 357.) He diagnosed sinus tachycardia, diabetes mellitus, and diabetic neuropathy. (Id.) Dr. Abraham referred Claimant to Syed Rasheed, M.D., for an evaluation of her diabetes and possible thyrotoxicosis. (Tr. at 347, 357.)

On November 6, 2006, Claimant reported that she believed her blood sugars were too low as she experienced dizziness and lightheadedness. (Tr. at 358.) Claimant also reported that she had breast cancer and had six months to live. (Id.) Claimant later reported however, that according to Dr. Yee, a biopsy indicated that she did not have cancer, though Claimant was concerned about the problem. (Id.) On December 1, 2006, Dr. Abraham acknowledged Claimant's complaints of a tingling sensation in both feet and a sore right foot. (Tr. at 360.) He referred Claimant to a podiatrist for a callus on her right foot, and continued his diagnoses of diabetes and diabetic neuropathy. (Id.) Claimant returned to Dr. Abraham on February 22, 2007, reporting that she experienced a near black out spell at her home and was examined by Dr. Maducdoc and was told she had a transient ischemic attack. (Tr. at 359.) Dr. Abraham's physical examination revealed no abnormalities and he referred Claimant to an ear, nose, and throat specialist for her upper respiratory infection. (Id.)

Claimant was examined by Dr. Rasheed on September 21, 2006, at which time his physical examination revealed extensive peripheral neuropathy in the lower extremities, with a loss of reflexes in the lower extremities. (Tr. at 347.) On October 19, 2006, Dr. Rasheed noted that

Claimant's diabetes was under better control and her peripheral neuropathy was treated. (Tr. at 349) He further noted that Claimant had mild suppression of her thyroid, for which no treatment was required. (Id.) Dr. Rasheed opined on February 22, 2007, that Claimant may have had some neuropathy in her left lower extremity and ordered a nerve conduction study. (Tr. at 352.) On March 22, 2007, Dr. Rasheed noted that the nerve conduction study revealed mild neuropathy, which was compatible with diabetes mellitus. (Tr. at 356.) He further noted that Claimant's diabetes mellitus was controlled and referred her to a neurologist for her neuropathy. (Id.)

On June 8, 2006, state agency medical consultant, Dr. Uma Reddy, M.D., completed a physical residual functional capacity ("RFC") assessment on which she opined that Claimant could perform work at the medium level of exertion, including lifting up to fifty pounds occasionally, twenty-five pounds frequently, standing or walking six hours out of an eight hour work day, and sitting six out of eight hours. (Tr. at 267.) She further opined that Claimant's ability to push or pull with her upper extremities was unlimited, though Claimant should avoid concentrated exposure to extreme cold, vibration, and hazards. (Tr. at 267, 70.) Dr. Reddy noted that while the medical evidence indicated some problems, most of her problems were attributed to her mental problems. (Tr. at 271.) In support of her opinion, Dr. Reddy noted the July, 2004, EMG/NCS, which revealed no evidence of carpal tunnel syndrome of Claimant's left upper extremity; the treatment notes of Dr. Mehta; and Dr. Maducdoc's May 18, 2006, consultative examination. (Tr. at 273.)

Dr. Rogelio Lim, M.D., another state agency medical consultant who completed a physical RFC assessment, likewise opined that Claimant was able to perform work at the medium level of exertion, with restrictions from concentrated exposure to extreme temperatures, vibration, and hazards. (Tr. at 298-305.) Dr. Lim acknowledged Claimant's diabetes and diabetic neuropathy, but noted that she had normal motor function, had full use of her upper and lower extremities, ambulated

11

without assistive devices, was able to walk on her heels and toes, and had back pain without radiculopathy. (Tr. at 303.) Thus, Dr. Lim concluded that Claimant had no significant physical limitation. (Id.) In support of his opinion, Dr. Lim noted the July, 2004, EMG/NCS, Dr. Maducdoc's May 18, 2006, consultative examination, Dr. Maducdoc's progress note of July 14, 2006, and Dr. Abraham's August 4, 2006, progress note. (Tr. at 305.)

In his decision, the ALJ summarized the medical evidence of record and Claimant's testimony. (Tr. at 14-16, 18-19.) The ALJ rejected Dr. Maducdoc's October 25, 2006, opinion because it was "not consistent with the medical evidence of record or even the examination performed by Dr. Maducdoc on May 18, 2006." (Tr. at 19.) The ALJ also rejected the opinions of the state agency medical consultants, Drs. Reddy and Lim, that Claimant was capable of performing medium exertional level work because they were "not consistent with the medical evidence of record." (Id.) Claimant alleges that the ALJ erred in failing to provide an explanation for his rejection of Dr. Maducdoc's opinion. Though the ALJ did not state specifically how Dr. Maducdoc's opinion was inconsistent with his treatment and the other evidence of record, the inconsistencies are clear from the ALJ's prior summary of the evidence. (Tr. at 14-16, 18-19.)

Dr. Maducdoc's May 18, 2006, examination essentially was normal, with only a slight or mild reduction in lower extremity strength. As discussed above, and in the ALJ's decision, Claimant had full range of motion of her upper extremities, with normal strength, grip, and fine manipulation. She had normal sensation and gait, and was able to walk on her heels and toes. Nothing in Dr. Maducdoc's examination supported his significant lifting limitations. Similarly, Dr. Maducdoc's other treatment notes do not reflect any limitations or findings supporting his assessment. Likewise, Dr. Abraham's physical examinations essentially were normal, with no motor weakness, and Dr. Rasheed's examinations revealed only mild lower extremity neuropathy, which was consistent with

Claimant's diabetes mellitus.

Citing <u>Wilson v. Heckler</u>, 743 F.2d 218 (4th Cir. 1984), Claimant argues that the ALJ erred in discounting Dr. Maducdoc's opinion as being inconsistent with the evidence of record because an ALJ "does not have the power to discount the functional conclusions of examining or treating physicians on the basis that such conclusions are not supported by clinical findings because he does not 'possess' any medical 'expertise.'" (Document No. 12 at 6.) The Court finds that Claimant's reliance on <u>Wilson</u> is misplaced. In <u>Wilson</u>, the ALJ found that the clinical findings of the claimant's examining physician, Dr. Marshall, did not support the severity of limitations assessed in his physical capacities evaluation. <u>Wilson</u>, 743 F.2d at 221. The Fourth Circuit however, found that Dr. Marshall's clinical findings were not significantly different from those of Claimant's treating physician, Dr. Flynn, and that there was "nothing in the record from any treating or examining physician any more beneficial to the Secretary than Dr. Marshall's report." <u>Id.</u> The Court therefore found that in

> finding that Dr. Marshall's clinical findings did not support his conclusions as to plaintiff's functional limitations, the ALJ erroneously exercised an expertise he did not possess in the field of orthopedic medicine. Not only for that reason, but because Dr. Marshall's diagnosis and conclusions were supported by those of Dr. Flynn, a treating physician, both of which were uncontradicted except as they differed from each other in degree, we are of opinion the finding of the ALJ that plaintiff's functional capacity was any greater than that described by Dr. Marshall is without substantial evidence to support it.

<u>Id.</u>

The instant case can be distinguished from the facts of <u>Wilson</u> in that Dr. Maducdoc's opinion is inconsistent with and contradicted by his own treatment notes, the examinations of Drs. Abraham and Rasheed, and the RFC assessments of the state agency medical consultants, to the extent that they do not recommend medium exertional level work. As discussed above, Claimant's physical examinations by Drs. Abraham and Rasheed essentially were normal with evidence of only

13

mild neuropathy, for which Dr. Rasheed referred her to a neurologist. Claimant's x-rays and Holter monitor were normal and her diabetes was controlled. Furthermore, despite pain in her feet, she was referred to a podiatrist for examination of a callus on her heel. The medical evidence reveals no significant limitations resulting from Claimant's physical impairments. The ALJ properly credited the opinions of the state agency medical consultants to the extent that they did not recommend medium work. See Smith v. Schweiker, 795 F.2d 343, 356 (4th Cir. 1986) (stating that "the testimony of a non-examining physician can be relied upon when it is consistent with the record" and that "if the medical expert testimony from examining or treating physicians goes both ways, a determination coming down on the side of the non-examining, non-treating physician should stand."). Furthermore, Dr. Maducdoc's progress notes contain limited clinical findings and do not support his strict lifting limitation.

Claimant also alleges that the ALJ erred in not considering all the factors set forth in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6), specifically, the length of Dr. Maducdoc's treatment relationship with Claimant and his specialization. Claimant correctly points out that the ALJ did not discuss specifically these two factors. However, as the Commissioner notes, "these additional factors provide little support for [Claimant's] claim." (Document No. 13 at 14.) Though Dr. Maducdoc was Claimant's treating physician, the medical evidence reveals that Claimant first sought treatment from him beginning on March 27, 2006, and subsequently was examined by him on at least nine occasions. Furthermore, as the Commissioner notes, the medical records indicate that Dr. Maducdoc was a family practitioner, and not a specialist as Claimant purports. Accordingly, the Court finds that while it may have been error for the ALJ not to address these two factors, such error is harmless as such failure does not impact the ALJ's decision. Accordingly, the Court finds that the ALJ's decision to accord no weight to Dr. Maducdoc's October 25, 2006, opinion is supported by

substantial evidence of record.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion/Brief in Support of Complaint (Document No. 12.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 13.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: September 19, 2008.

R. Clarke VanDervort
United States Magistrate Judge